IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. JOEL COMPTON, | : | |
| Plaintiff-Relator, | : | |
| v. | : | Civil Action No. 7:07-cv-32 (HL) |
| CIRCLE B. ENTERPRISES, INC., *et al.*, | : | |
| Defendants. | : | |

## ORDER

Before the Court are motions to dismiss filed by the Defendants (Docs. 105, 111, 112, and 116). For the following reasons, the motions to dismiss are denied.

**I.   PROCEDURAL BACKGROUND**

Plaintiff-Relator Joel Compton ("Compton") filed a *qui tam* action on behalf of the United States ("the Government"). In the complaint, Compton alleged that Defendant Circle B Enterprises, Inc. ("Circle B") presented false claims to the Government in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et al*. Compton named Circle B, Jackie Williams, Patricia Williams, Destiny Industries, L.L.C. ("Destiny"), River Birch Homes, Inc. ("River Birch"), Waverlee Homes, Inc. ("Waverlee"), Liberty Homes, Inc. ("Liberty Homes"), Phil Fowler, Delmo Payne, and Gerald Terrell as Defendants.

The Defendants filed motions to dismiss the complaint contending that the Court did not have subject matter over the case, that the complaint failed to state a

claim upon which relief can be granted under Rule 12(b)(6), and that the complaint failed to satisfy Rule 9(b) of the Federal Rules. After briefing on the motions was complete, the Court ruled that it had subject matter jurisdiction over the case, but that Compton failed to state a claim for relief under Rule 12(b)(6) and failed to plead his allegations of fraud with particularity as required by Rule 9(b). The motions to dismiss were granted. The Court provided Compton the opportunity to amend his complaint.

Compton filed an amended complaint against the same Defendants containing additional allegations in support of his claims. The Defendants have moved to dismiss Compton's amended complaint asserting that the amended complaint does not correct the former complaint's deficiencies. The Court disagrees and denies the motions to dismiss (Docs. 105, 111, 112, 116).

The Court has reviewed the motions and briefs of the parties and feels that it can resolve the motions to dismiss without oral argument. The Defendants' request for oral argument (Doc. 126) is therefore denied.

## II. RELEVANT ALLEGATIONS IN THE AMENDED COMPLAINT

According to Compton's amended complaint, Compton worked as a controller for Circle B, a manufacturer of pre-fabricated modular housing. (Am. Compl. ¶¶ 5, 6). In August 2004, Circle B entered into a contract with the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") in which Circle B agreed to provide FEMA 1,000 mobile homes in exchange for payment from

2

the Government. (Am. Compl. ¶ 10). Circle B could not manufacture the mobile homes since it was a pre-fabricated modular housing manufacturer, so it contracted with subcontractors to fulfill its FEMA contract obligations. (Id.). The subcontractors included Destiny, River Birch, and Waverlee. (Id.). Jackie Williams ("Williams"), the president of Circle B, dealt with Phil Fowler of Waverlee, Delmo Payne of River Birch, and Donnie Edwards of Destiny. (Id.).

Sometime between May 2005 and August 2005, Williams told Compton that another opportunity would likely arise for Circle B to work with FEMA. (Am. Compl. ¶ 11). Williams discussed with Compton his plans to obtain another contract to sell mobile homes in the event that such an opportunity arose. (Id.). During this discussion, Williams explained to Compton that he was concerned that Waverlee, Destiny, and River Birch would "cut out" Circle B from any future FEMA contract and "instead would contract directly with FEMA in selling mobile homes" because the "companies were now known to FEMA" and because "Circle B itself could not manufacture mobile homes." (Am. Compl. ¶ 12). Williams told Compton that Waverlee, Destiny, and River Birch "had expressed resentment that they, rather than Circle B, had done all of the work in connection with the 2004 contract." (Id.).

The complaint then describes that

> Within approximately three weeks after Williams discussed with [Compton] Williams' concern that Circle B would be "cut out" of any future FEMA contract, Williams told [Compton] that he had met in person with these representatives of Destiny, Waverlee, and River Birch named above, and they

3

>had agreed on a plan for the next opportunity for a contract to sell mobile homes to FEMA. Williams further told Relator that he was no longer concerned that these manufacturers would try to sell directly to FEMA, and that he could go to FEMA on a future contract without worrying that the other manufacturers would seek to "cut out" Circle B.

(Am. Compl. ¶ 14).

Following Hurricane Katrina, the Government decided to provide mobile homes to the victims as part of its disaster relief efforts. (Am. Compl. ¶16). FEMA entered into another contract with Circle B ("the FEMA contract") on September 20, 2005. (Am. Compl. ¶17). Circle B agreed to provide FEMA up to an estimated 7,000 standard mobile homes and 1,000 mobile homes designed to accommodate individuals with disabilities. (Id.). The contract was an indefinite quantity contract, so even though Circle B agreed to provide approximately 8,000 mobile homes to FEMA, FEMA could change contractors and purchase mobile homes from another company. (Am. Compl. ¶ 18).

Like it did in 2004, Circle B entered into subcontracts to fulfill its FEMA contract obligations. (Am. Compl. ¶ 23). Circle B entered into written subcontracts with Destiny, River Birch, Waverlee, and Liberty (Waverlee's affiliate). (Am. Compl. ¶ 24). The subcontracts provided that the mobile home manufacturers would perform all the manufacturing work required under the FEMA contract and deliver the mobile homes to FEMA. (Am. Compl. ¶ 25). Circle B also subcontracted with third party

manufacturers.[1] Circle B retained a $4,000 profit for each mobile home sold to FEMA. (Am. Compl. ¶ 26). To make the payments according to the terms of the written subcontracts, Circle B entered into an escrow agreement with Wachovia Bank. (Am. Compl. ¶ 27). FEMA would pay money to Wachovia and Wachovia, Circle B's escrow agent, would distribute funds to Circle B and to the subcontractors. (Id.).

Williams disclosed to Compton in November 2005 that he had a separate payment agreement with Liberty, Destiny, and River Birch. (Am. Compl ¶ 28). The agreement was that Williams would pay Liberty, Destiny, and River Birch payments called rebates. (Id.). Rebate payments were also to be made to individuals at the subcontracting companies including to Phil Fowler, Delmo Payne, and Gerald Terrell. (Id.). Williams told Compton that the payments were not set forth in any written agreement, but were part of a "gentlemen's agreement." (Id.). Williams instructed Compton to make the rebate payments out of the $4,000 profit that Circle B retained for each mobile home. (Id.). The profits from the FEMA contract were retained in Circle B's Bank of America account, an account created by Williams and which was not Circle B's regular operating account. (Id.). The additional payments totaled about $8.9 million. Specifically, $6 million was paid to Defendants Phil Fowler, Delmo Payne, and Gerald Terrell. (Am. Compl. ¶ 28). The remaining $2.925

---

[1] The manufacturers included Giles Industries of Tazell, Inc., Lexington Homes, Inc., Patriot Manufacturing, Inc., Alliance Homes, Inc., Town Homes, LLC, and Cavalier Homes Builders, LLC. (Am. Compl. ¶ 24).

million went to the subcontracting companies themselves. (Id.).

Compton asked Williams whether he should create an account in Circle B's general ledger for the rebate payments. Williams told Compton "that he should not do so, and that the payments should not be recorded in the corporation's books." (Am. Compl. ¶ 29). Compton maintained the company's general ledger and to the best of his knowledge, the payments were not written in the general ledger. (Id.). Phil Fowler and Delmo Payne also told Compton to handle the rebate payments differently from other matters relating to the FEMA contract, so that others would not see the information about the payments. (Am. Compl. ¶ 35). Williams further instructed Compton not to disclose the rebate payments to anyone. (Id.).

When Compton tried to set up the rebate payments, Compton was told by Bank of America that Williams' signature was needed before the payments could issue. (Am. Compl. ¶ 37). Compton observed Williams sign requests for payment and he saw bank statements describing wire transfers from Circle B's Bank of America account to the Defendants. (Am. Compl. ¶¶ 37, 38).

Compton was personally responsible for reviewing the invoices Circle B presented to FEMA for payment. (Am. Compl. ¶ 45). He saw bank statements showing transfers from the Government to Circle B. (Id.).

Compton alleges in the amended complaint that the oral agreement to make the payments existed so that the subcontractors would not sell mobile homes directly to the Government. The payments, he claims, had the effect of preventing the

6

subcontracting companies from selling mobile homes to the Government. (Am. Compl. ¶ 52).

His proposed theory of liability is that the payments made and accepted pursuant to the oral agreement violated the Anti-Kickback Act ("AKA"), 41 U.S.C. § 51-56, and the FCA. Under this theory, the payments constituted kickbacks and any request for payment that included the kickback amount submitted by Circle B to FEMA on an invoice was a false claim.

### III. THE COURT'S RULING ON THE FIRST MOTION TO DISMISS

In its previous order, the Court determined that if adequate facts are alleged and proven, then the rebate payments constitute kickbacks as defined by the AKA and also violate the FCA because compliance with the AKA is a prerequisite to Government payment pursuant to a Government contract.

The first problem with Compton's original complaint was that it did not allege that compliance with the AKA was a prerequisite to the Government paying Circle B what it was owed under the contract. The second problem with Compton's complaint was that it did not allege a fraudulent scheme to submit false claims for payment with any particularity. The Court did not reach the separate, but related question of whether the allegations regarding the fraudulent scheme stated a plausible claim for relief.

In his amended complaint, Compton alleges that compliance with the AKA is a condition of payment under the contract because "[t]he AKA prohibits the amount

7

of a kickback from being included in the contract price, and the Government is precluded from including the amount of the kickbacks in any payment under a contract." Therefore, the only issues presented in the Defendants' second motions to dismiss are: (1) whether the allegations in the complaint state a plausible claim for relief as required by Rule 8(a) and 12(b)(6) of the Federal Rules; and (2) whether the allegations in the complaint state a claim for fraud with particularity as required by Rule 9(b) of the Federal Rules.

## IV. LEGAL STANDARDS

### A. Rule 12(b)(6) Plausability Standard

The general rule in federal court is that a complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to survive a Rule 12(b)(6) motion to dismiss a plaintiff is required to provide factual allegations that raise a right of relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To resolve a motion to dismiss, the district court "may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1940-41, 173 L.Ed.2d 868 (2009). Then, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

A plausible claim for relief is one that creates more than a suspicion of

entitlement to relief. Twombly, 500 U.S. at 555 (citing 5 C. Wright & A Miller, Federal Practice and Procedure, 1216, pp. 235-236 (3d ed. 2004)). When alleging a conspiracy, the plaintiff must allege facts that plausibly suggest and are not merely consistent with an agreement. Id. at 557. If the complaint suggests an equally likely, or more likely, lawful alternative explanation for conduct, then the plaintiff has not alleged a plausible claim for a conspiracy. Id. at 567-68; see also Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1289 (11th Cir. 2010) (explaining that the complaint in Twombly failed because it "did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct-because such parallel conduct was more likely explained by lawful, independent market behavior . . . .").

### B. Rule 9(b) Particularity Standard

In addition to stating a plausible claim to relief, a plaintiff alleging a violation of the FCA must meet the heightened pleading requirements of Rule 9(b). United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1308-09 (11th Cir. 2009).

Rule 9(b) protects defendants from "frivolous suits, or spurious charges of immoral and fraudulent behavior." Id. at 1313 n. 24 (quotation and citation omitted). Plaintiffs are therefore required to "specifically plead the minimum elements of their allegation" so as to prevent them from learning of the complaint's essentials through discovery and causing needless harm to a defendants' goodwill and reputation. Id. The rule also protects defendants from needless settlements based on unfounded

9

allegations. Id. Further, when enforced, the rule ensures that claims allowed to proceed to discovery will have boundaries and discovery limits. United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1360 (11th Cir. 2006). Rule 9(b) is important in FCA actions because it "ensures that the relator's strong financial incentive to bring an FCA claim – the possibility of recovering between fifteen and thirty percent of a treble damages award – does not precipitate the filing of frivolous suits." Id.

Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). If a fraud claim is not stated with particularity, then the claim must be dismissed. "Particularity means that a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Atkins, 470 F.3d at 1357 (citation and quotations omitted). Stated another way, a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." Am. Dental Ass'n, 605 F.3d at 1291 (citation omitted).

## V. DISCUSSION

### A. Section 3729(a)(1)[2]

Compton seeks to hold the Defendants liable under 31 U.S.C. § 3729(a)(1), which imposes liability on "[a]ny person who ... knowingly presents, or causes to be presented, to an officer of employee of the United States government . . . a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1). "Without the presentment of ... a [false or fraudulent] claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the FCA." Clausen, 290 F.3d at 1311.

The Court dismissed Compton's original complaint because although it alleged the existence of a fraudulent scheme, it provided inadequate details about the scheme. Because the scheme was not pled with particularity, the Court could not find that there was sufficient allegations that a false claim was presented to the Government for payment. The Defendants now contend that Compton's amended complaint is as deficient as his first in that the amended complaint fails to present specific facts regarding the existence of the purported scheme or agreement.

The Court finds that the complaint's § 3729(a)(1) claim satisfies the Rule 8(a) plausibility and Rule 9(b) particularity standards. The complaint explains that a plan

---

[2] Section 3729(a)(1) was recodified at § 3729(a)(1)(A) as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"). As explained by the Court in its first order on the motions to dismiss, the amendments to the FCA not apply to this case. Consequently, the Court refers to the former FCA subsections.

existed and that the plan was created within three weeks after Williams explained to Compton that he was going to meet with Donnie Edwards, Phil Fowler, and Delmo Payne about future collaboration on a FEMA project. The complaint next describes that Williams told Compton that these Defendants were participating in the plan. Taken alone, these facts do not establish a fraudulent scheme with particularity. The facts do establish, however, that there was a plan, or agreement, between Williams and representatives of Destiny, Waverlee, and River Birch.

Compton goes on to allege facts that are particular and make it plausible that the plan's terms were that Circle B would provide payment to Liberty, Destiny, and River Birch and individuals at the companies in exchange for their agreement not to contract directly with FEMA. During the conversation between Williams and Compton where Williams disclosed the existence of a plan, Williams told Compton that Williams was no longer concerned that these manufacturers would try to sell directly to FEMA, and that he could go to FEMA on a future contract without worrying that the other manufacturers would seek to "cut out" Circle B.[3] Williams then told Compton that the plan related to what the members of the plan would do when the next opportunity to contract with FEMA arose. These facts are evidence showing

---

[3] Explanation is provided in the complaint for why Williams was concerned about losing another FEMA contract. Williams told Compton he was concerned about being cut out of future contracts with FEMA since Waverlee (Liberty's affiliate), Destiny, and River Birch were now known to FEMA. Waverlee, Destiny, and River Birch also expressed resentment that they had done all the work for the 2004 FEMA contract and not Williams.

12

that the purpose of the plan was to eliminate Williams' concern that the manufacturers would sell directly to the government the next time a FEMA contract opportunity arose. That Williams told Compton to begin paying the manufacturers additional payments from Circle B's FEMA bank account is circumstantial evidence that the additional payments were the consideration of the plan.

The strongest factual allegations making it plausible that the plan was an agreement for the unlawful purpose of defrauding the Government and not a lawful purpose is that $2.925 million was paid to three individuals and the total payments, exceeding $8.9 million, were not recorded in Circle B's general ledger or otherwise disclosed pursuant to Williams', Phil Fowler's, and Delmo Payne's instructions. The Court cannot understand why individuals, and not the subcontracting companies, would receive $2.925 million. It also defies the Court's common sense that $8.9 million would not be recorded or disclosed on Circle B's accounting records. Although the Court is not familiar with specific accounting practices, it cannot imagine an instance where it would be appropriate and in line with basic accounting principles not to record payments of such substantial amount. Although Compton did not specifically allege that Circle B had a duty to record payments of $8.9 million, it is inconceivable to the Court that Circle B would not have a basic duty to record the payments considering their magnitude.

Because the payments are alleged to be unrecorded and because payments were made to individuals at the company, this is not a case where the plaintiff has

alleged facts that are both consistent with lawful and unlawful conduct. It is not speculation to conclude that some form of payment would constitute a term of the plan, the purpose of which was to eliminate Williams' concern that the subcontractors would deal directly with the Government. The logical conclusion to draw from all the facts is that the Defendants agreed that Circle B would pay the subcontracting companies and their representatives additional money in exchange for their promise not to undercut Circle B's contract price.

The fact that the rebate payments were made from a bank account and viewable on bank transaction records does not make the allegations less believable. Compton alleges personal knowledge that the individual Defendants did not want the payments disclosed on Circle B's records and that they did not want anyone to know about the payments. The Defendants' use of a bank to conduct the alleged scheme may have rendered the scheme imperfect, but that does not mean that a fraudulent scheme is insufficiently alleged.

The Defendants next argue that the payments, even if made for the purpose of restricting sales of mobile homes to the Government, cannot constitute kickbacks. The Court will not rehash this argument, as it ruled previously that the payments, if proved to be made pursuant to the alleged agreement, constitute kickbacks and that the Defendants' conduct, if true, would violate the AKA. The Defendants further argue that they could not have agreed for Circle B to charge an inflated price for the contract because the contract was a fixed-price contract. The Court already

concluded in its previous order that the fixed nature of the contract is irrelevant to whether the allegations, if sufficiently pled, state FCA violations. If it is proven that Circle B included in its contract price the cost of the kickbacks paid to the subcontracting companies, then that conduct can give rise to FCA liability. In such a case, the loss the Government sustained was at least the cost of the kickbacks it paid to Circle B.

In addition, that there were other companies contracting with FEMA not involved in the fraudulent scheme does not detract from the claim's plausibility. The complaint explains that Williams told Compton that he was worried that the named Defendant subcontracting companies would try to undercut Circle B's contract price in the event that FEMA required mobile homes. The reason for this concern was that Circle B used the subcontracting companies in the 2004 FEMA contract. The subcontracting companies were known to FEMA by 2005, which caused Circle B to worry that FEMA would contract directly with them. These allegations make it plausible that Williams entered into the agreement with the subcontracting companies for the purpose of preventing them from contracting directly with FEMA.

The amended complaint alleges with particularity who participated in the fraudulent scheme as well as the nature of the fraudulent scheme, what was to be gained from the fraud, and when the fraudulent scheme went into play. Compton connects the fraudulent agreement to acts taken pursuant to the agreement by explaining that Circle B made unrecorded payments and the subcontractor

15

Defendants accepted the unrecorded payments. Further, Compton's assertions are based on what Williams and the other Defendants told him and thus are based on Compton's first hand knowledge. The sum of the allegations makes it plausible that Circle B entered into a fraudulent scheme with the other Defendants and pursuant to that agreement Circle B made unrecorded payments totaling more than $8.9 million so that the recipients of the payments would not contract directly with the Government.

Finally, Compton has adequately pled actual submissions of false claims. Compton explains that he was the person primarily responsible for ensuring that mobile home invoices were submitted to the Government. He has personal knowledge that approximately 400 invoices were submitted to the Government for payment by Circle B and that the Government paid the amount presented on the invoices by wiring funds to Circle B's FEMA account at Wachovia Bank.

The complaint adequately alleges that every invoice submission included the cost of the rebate payments and that the Government made payments in the amount presented on the invoices. As already ruled by the Court, failing to disclose such payments is a misrepresentation to the Government and any request for payment is a false claim.

Accordingly, the § 3729(a)(1) claim will not be dismissed against any of the Defendants for failure to state a claim or for failure to allege fraud with particularity.

B.  Section 3729(a)(2)[4]

Subsection of (a)(2) of § 3729 makes liable any person "who knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).  To be liable under this section, "a plaintiff must prove that the government in fact paid a false claim." Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1329 (11th Cir. 2009). Also the plaintiff must "allege that the defendants intended for the government to rely on [the] false statements in deciding whether to pay a false claim." Id. at 1330.

Compton's complaint alleges that Williams and the subcontracting companies and their representatives agreed on a plan regarding any future FEMA contract for mobile homes.  Because of this plan, Williams was no longer worried about being undercut by the subcontracting companies.  After Circle B acquired another FEMA contract, Williams instructed Compton to make payments to the subcontracting companies and their representatives.  The payments, exceeding $8.9 million, were not to be recorded in the company's general ledger and were to be made from Circle B's FEMA account.  The plausible inference that is drawn from these allegations is that Circle B would pay the subcontracting companies and their representatives additional money received from FEMA for the purpose of restricting the subcontracting companies from selling mobile homes to the Government.   These

---

[4] As the Court explained in its previous order the amended version of this subsection does not apply to this case.

17

allegations are sufficient to show that the Defendants intended for the Government to rely on Circle B's false invoices for payment. Since the complaint alleges that FEMA paid Circle B for the amounts Circle B billed, then the complaint sufficiently alleges that the Government in fact paid a false claim. Accordingly, the § 3729(a)(2) claim will not be dismissed against any of the Defendants.

C. Section 3729(a)(3)[5]

Compton alleges violations of the FCA's conspiracy provision, § 3729(a)(3). To establish conspiracy liability under the FCA, Compton must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid." United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009) (citation omitted). To conspire means to agree to achieve an unlawful purpose. Id. (citation omitted). In other words, there must be a meeting of the minds. Id. (citation omitted). In reference to the FCA, a complaint must contain proof "that the conspirators intended 'to defraud the Government.' " Id. (citing Allison Engine Co., Inc. v. United States ex rel. Sanders, 555 U.S. 662, 672, 128 S. Ct. 2123, 2130, 170 L.Ed.2d 1030 (2008)).

---

[5] FERA recodified the conspiracy provision from § 3729(a)(3) to § 3729(a)(1)(C). Again because the former sections of the FCA apply to this case, the Court refers only to § 3729(a)(3) when discussing the Defendants' liability under the FCA's conspiracy provision.

18

Compton's complaint shows the existence of an agreement made by the Defendants to defraud the Government with sufficient particularity. It describes how Williams informed Compton that he and the subcontracting companies had agreed on a plan for future FEMA contracts that eliminated Williams' concern about being cut out of a future FEMA contract. It also describes that Compton was asked to make unrecorded payments exceeding $8.9 million to the subcontracting companies and their representatives from Circle B's FEMA bank account. These are particular facts that could easily lead a reasonable jury to infer that the terms of the agreement were that the payments would serve as consideration for the promise not to deal directly with the Government.

Compton's complaint also alleges particular facts showing that acts were taken in furtherance of the conspiracy. Circle B made additional payments to the subcontracting companies and their representatives. The complaint alleges that the subcontracting companies and their representatives accepted the payments and also instructed Compton to not record the payments in Circle B's accounting ledger.

In total, the § 3729(a)(3) claim states particular facts showing a conspiracy to defraud the Government. The allegations on the claim also raise a plausible right to relief. The § 3729(a)(3) claim will not be dismissed against any of the Defendants.[6]

---

[6] The collusion theory of liability is not dismissed for the same reasons that the conspiracy claim is not dismissed.

## VI. CONCLUSION

There are sufficient facts in the amended complaint to establish plausible claims for relief and fraud with particularity. Accordingly, the Defendants' motions to dismiss are denied. The case will proceed to discovery. The Court's Rule 16/26 Order will be issued shortly.

**SO ORDERED**, this the 3rd day of February, 2011.

         *s/ Hugh Lawson*
         **HUGH LAWSON, SENIOR JUDGE**

lmc